**V I R G I N I A:**
### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| **ADAM KAMRAN** | ) | |
| 1348 Red Hawk Cir. | ) | |
| Reston, Virginia 20191 | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No: 2020-0779** |
| | ) | |
| **SURE SECURE SOLUTIONS, LLC** | ) | |
| 1984 Issac Newton Square West, Suite 202 | ) | |
| Reston, Virginia 20190 | ) | |
| | ) | |
| **Serve:** Narjis B. Ali | ) | |
| 12356 Lima Lane | ) | **DEMAND FOR JURY TRIAL** |
| Reston, Virginia 20191 | ) | |
| Registered Agent | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **NARJIS ALI** | ) | |
| 12356 Lima Lane | ) | |
| Reston, Virginia 20191 | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MOHSIN HUSSAIN** | ) | |
| 324 Blue Oak Lane | ) | |
| Los Altos Hills, California 94022 | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

### COMPLAINT
### (Includes Request for Injunctive Relief)

Plaintiff Adam Kamran ("Kamran"), by through undersigned counsel, hereby states as

follows for his Complaint against Defendants Sure Secure Solutions, LLC ("Sure Secure" or the

"Company"), Narjis Ali ("Ali") and Mohsin Hussain ("Hussain") (hereinafter collectively

Exhibit A to
Notice of Removal

referenced as "Defendants", with Ali and Hussain referenced collectively as the "Individual Defendants").

## NATURE OF THE CASE

1.      In this civil action, Plaintiff Adam Kamran seeks to rectify breaches of certain agreements as well as other unlawful practices perpetrated upon him by Sure Secure, Defendant Ali (the Company's majority owner), and Defendant Hussain (Ali's son-in-law and an owner of Sure Secure).

2.      Over the years of his tenure as an owner and employee of the Company, Kamran has purchased and earned a large number of equity membership units in Defendant Sure Secure through the Company's membership unit subscription agreement, the Company's equity compensation plan, the Company's deferred compensation agreement, and through the grant of additional units to him in recognition of his outstanding service to the Company as an employee since March 19, 2010, and continuing through December 2019. As of the date of this filing, Kamran is the owner of at least seventy-three (73) units of membership in Sure Secure, making him an owner of at least 36 percent of the Company (which needs to be adjusted to include additional units awarded to Kamran and to exclude unjustifiable units improperly awarded to Defendant Hussain).

3.      Defendants have never afforded Kamran the benefits attendant to his actual ownership interest in the Company.  To that end, over the past five years and continuing, Defendant Sure Secure (as controlled by Ali and Hussein) has misrepresented Kamran's ownership stake in a number of official government submissions, including the Company's tax returns.

4.      Defendants' have systematically oppressed Kamran's rights as the owner of at least 36% of Sure Secure by (among other things): (a) refusing to allocate and distribute Kamran's true proportionate share of gains and losses to him; and (b) diluting his voting rights and power.  As described below, these actions were designed to enrich Ali and her family, and to ensure that they retained total control of Sure Secure.

5.      Kamran also seeks damages against Defendants Ali and Hussain for their willful and malicious acts in concert through which they intentionally damaged Kamran's business interest in Sure Secure. Ali and her son-in-law, Hussain, worked together to make sure that Sure Secure would never recognize the full extent of Kamran's ownership interest in the Company, thereby depriving him of the full benefits of that ownership. Pursuant to Virginia Code §§ 18.2-499 and 500, Kamran is entitled to recover treble damages, costs and attorneys' fees from Ali and Hussain for this civil conspiracy.

6.      Defendant Sure Secure violated the False Claims Act, 31 U.S.C. § 3730(h) by terminating Kamran in retaliation for expressing concerns that Sure Secure's misrepresentations to the Small Business Administration and other government agencies regarding the percentage of ownership held by each of its owners was unlawful.

7.      In addition, Defendant Sure Secure has failed to pay Kamran his full compensation due and owing to him at the time of his termination. Sure Secure awarded Kamran a bonus in the gross amount of $226,983.96[1] and stated that it intended to award 11.67 membership units to him in lieu of that cash award. Sure Secure has neither awarded those units

---

[1] The gross amount was calculated by Sure Secure's accountant, at the direction of Ali, based on the applicable 2018 tax laws, Kamran's joint filing status with his spouse, and Sure Secure's promise to pay the applicable payroll and income tax on the bonus. The net amount is approximately $124,320.00.

nor paid the cash bonus of $226,983.96 to Kamran. Pursuant to Virginia Code § 40.1-29, Kamran is entitled to recover treble damages and attorneys' fees from Sure Secure.

## THE PARTIES

8.      Plaintiff Kamran is a natural person who resides at 1348 Red Hawk Circle, Reston, Virginia 20191.

9.      Defendant Sure Secure is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at 1984 Isaac Newton Square West, Suite 202, Reston, Virginia 20190. Sure Secure provides end-to-end information technology services to its federal customers. Sure Secure provides security services, web application development, and infrastructure/cloud architecture among its areas of expertise. From 2010 through February 9, 2019, Sure Secure was an SBA-certified Section 8(a) Small Disadvantaged Business (SDB); since 2010, it has also been self-certified as an Economically Disadvantaged Woman-Owned Small Business (EDWOSB). Sure Secure did not qualify for these set-aside programs because Ali—the owner on whose status Sure Secure based its self-certification—owned less than 66 percent of the company's membership units, and therefore could not control the decisions for which the company's operating agreement required a supermajority vote.

10.     Defendant Ali is a natural person who, upon information and belief, resides at 12356 Lima Lane, Reston, Virginia 20191.

11.     Defendant Hussain is a natural person who, upon information and belief, resides at 324 Blue Oak Lane, Los Altos Hills, California. Hussain is Ali's son-in-law.

4

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this matter pursuant to Va. Code § 17.1-513 because this matter involves damages exceeding $100.00, exclusive of interest.

13.     This Court has personal jurisdiction over Defendant Sure Secure pursuant to Va. Code § 8.01-328.1 because Defendant Sure Secure transacts business in this jurisdiction.

14.     This Court has personal jurisdiction over Defendant Ali pursuant to Va. Code § 8.01-328.1 because Defendant is a resident and transacts business in this jurisdiction.

15.     This Court has personal jurisdiction over Defendant Hussain pursuant to Va. Code § 8.01-328.1 because, at all relevant times, Hussain was a member of a Virginia company located in Fairfax County, Sure Secure Solutions, LLC, and traveled to Fairfax County, Virginia, on numerous occasions to participate in Sure Secure Solutions, LLC business.

16.     Venue is proper in this Court pursuant to Va. Code § 8.01-261 because the causes of action set forth in this Complaint arose in this jurisdiction.

## FACTS COMMON TO ALL CLAIMS

17.     On or around October 15, 2004, Ali formed Sure Secure as a Virginia limited liability company. Ali was initially the sole member and manager of Sure Secure.

### *Kamran Becomes a Member of Sure Secure*

18.     Kamran became a member of Sure Secure in or around March 2010 upon execution of a Member Unit Subscription Agreement and an Adoption Agreement pursuant to which he accepted the terms of Sure Secure's operating agreement.

19.     On or about March 16, 2010, Sure Secure adopted the amended and restated operating agreement.

20.     That operating agreement has since been amended at least twice. As a member of Sure Secure, Kamran is a party to the subsequent amended versions of the operating agreement, and the amendments thereto.

21.     On March 19, 2010, pursuant to the Membership Unit Subscription Agreement, Kamran purchased nine (9) voting membership units of Sure Secure for the amount of four thousand dollars ($4,000.00) per unit. Based upon his ownership of 9 voting shares, at that time, Kamran owned approximately 8.5 percent of the voting membership units of Sure Secure.

22.     At the time that he became a member of Sure Secure, Ali expanded the Board of Managers of the Company to include Kamran, Hussain and one other member.

23.     On or around March 20, 2010, Kamran also became an employee of Sure Secure, pursuant to a written employment agreement.

24.     Kamran is a broadly skilled, innovative, experienced, and successful IT executive and PMI (Project Management Institute) certified project manager with expertise in setting up and managing businesses. Kamran has years of progressive experience in IT research and development, strategy consulting and negotiations, managing start-ups, cross-functional team building, optimizing business processes, and change management.

25.     During his tenure as an employee of Sure Secure, Kamran delivered top-quality performance of all of his duties, which Ali recognized numerous times.

26.     Kamran later assumed the title of Advisor to President for Legal and Strategy Matters. In January of 2011, Ali also appointed Kamran as Sure Secure's Chief Operating Officer along with the responsibilities of Chief Financial Officer, which he conducted at the direction and approval of Ali as the Chief Executive Officer.

*The Equity Compensation Plan and the Deferred Compensation Agreement*

27.     At or about the time that he joined Sure Secure as a member/owner and employee, Kamran executed, among others, two agreements with Sure Secure that provided ways in which he could purchase or otherwise be awarded additional membership units: (1) the Equity Compensation Plan; and (2) the Deferred Compensation Agreement.

28.     On March 19, 2010, Sure Secure and Kamran executed an agreement making him eligible to participate in Sure Secure's Equity Compensation Plan (the "Equity Compensation Plan").

29.     Under the Equity Compensation Plan, among other things, Sure Secure agreed to award phantom membership units, defined in the Equity Compensation Plan as "a right to receive a certain number of Units on the Conversion date" (the date on which Phantom Units are converted into Units). "Units" represent equity membership interest in Sure Secure.

30.     The award of the phantom units was conditioned upon (i) execution of Sure Secure's operating agreement by the employee; and (ii) Sure Secure's board's determination that issuing the units would not violate securities laws. The awards were to be made at the end of each quarter during the period from March 17, 2010, to March 31, 2012.

31.     The Equity Compensation Plan provided that the awarded phantom units would convert to equity membership units upon the first to occur of (a) a Change in Control (as defined in the Equity Compensation Plan); (b) an initial public offering of Sure Secure; or (c) March 31, 2014.

32.     Upon becoming a member of the Company on March 19, 2010, Kamran executed an adoption agreement accepting the terms of Sure Secure's operating agreement and was awarded phantom units for seven of the eight quarters during which he was eligible. In the first

quarter of 2012, Ali did not issue phantom units; instead she offered to pay out the deferred income for that quarter as unpaid wages with interest.

33.     In total, Kamran was awarded twelve (12) additional phantom units under the Equity Compensation Plan.

34.     Neither a Change in Control (as defined in the Equity Compensation Plan) or an initial public offering of the Company occurred. Thus, under the terms of the Equity Compensation Plan, Kamran's twelve (12) phantom units converted to equity membership units on March 31, 2014, adding to his ownership stake in the Company.

35.     On March 19, 2010, Kamran and Sure Secure executed a Deferred Compensation Agreement (the "Deferred Compensation Agreement").

36.     The Deferred Compensation Agreement permitted Kamran to defer a portion of his compensation (from March 19, 2010, through March 31, 2012) in exchange for additional convertible phantom units.

37.     The Deferred Compensation Agreement provided that the phantom units for which Kamran became eligible under its terms would be awarded on the schedule set forth in the Equity Compensation Agreement, and would convert to membership units in Sure Secure under the same terms as those in the Equity Compensation Plan. Thus, under the Deferred Compensation Agreement (as under the Equity Compensation Plan), awards of phantom membership units were to be made at the end of each quarter during the period from March 17, 2010, to March 31, 2012, and, in the absence of a Change of Control (as defined in the Equity Compensation Plan) or an initial public offering, the units would convert to equity membership units as of March 31, 2014.

38.     Pursuant to the Deferred Compensation Agreement, between 2010 and 2012, Kamran deferred a total of $290,000 in salary, in part to assist with Sure Secure's cash flow.

39.     The Deferred Compensation Agreement included a provision pursuant to which Kamran also earned additional deferred compensation. Under that provision, Kamran earned an additional $45,000 each quarter during the period March 17, 2010, to March 31, 2012.

40.     The total compensation that Kamran deferred and that he earned under the Deferred Compensation Agreement from 2010 to 2012 was $651,640.

41.     Since Kamran's eight-quarter eligibility to earn phantom units under the Deferred Compensation Agreement ended at the end of March 2012, beginning in April 2012, his further deferred salary was recorded in the books and was paid to him as the Company was able. Even after he stopped earning phantom units Kamran continued to defer his salary from time to time to assist the Company with its cash flow, thus making him the Company's most significant creditor/investor.

42.     Under the terms of the Deferred Compensation Agreement, Kamran was awarded fifty-one (51) phantom membership units.

43.     A Change in Control or an initial public offering of the Company did not occur, and Kamran's additional fifty-one (51) phantom units converted to equity membership units on March 31, 2014, further adding to his ownership stake in Sure Secure.

44.     In addition, in or about March 2011, Kamran received one bonus membership unit in recognition of his role as a key employee of the Company.

45.     Thus, as of March 31, 2014, Kamran owned a total of seventy-three (73) membership units in Sure Secure (9 purchased units plus 1 bonus unit plus 12 units under the Equity Compensation Plan and 51 units under the Deferred Compensation Agreement). These

units represented more than 35 percent of the membership units in Sure Secure at that time. After the company thereafter bought back units from exiting members, Kamran's percentage ownership of Sure Secure has increased.

### Sure Secure terminates Kamran after dispute over ownership and erroneous financial records

46.     Ali caused Sure Secure to file various submissions with federal agencies in which it made false representations about its ownership.

47.     For example, Ali caused Sure Secure to file submissions with the SBA in which it inaccurately identified the true and correct ownership percentages of its owners. Between 2010 and 2019, Sure Secure participated in the SBA's Section 8(a) program based on Ali's status as a socially disadvantaged individual based upon her ethnicity. Under that program, based upon a certification that Ali owned and controlled Sure Secure, the Company was eligible for certain federal contracts set aside for participants in the Section 8(a) program.

48.     SBA regulations limit participation in the Section 8(a) program to companies that are unconditionally owned and controlled by a socially or economically disadvantaged person. On information and belief, Sure Secure was qualified as a Section 8(a) participant solely based on Ali's status as socially disadvantaged based upon her ethnicity.

49.     As a general matter, in the case of a limited liability company, the SBA defines unconditional ownership as direct ownership by the disadvantaged person of at least 51 percent of every class of stock in the limited liability company. Similarly, the SBA defines control of a limited liability company to mean that the disadvantaged person controls the decision-making of the management of the company.

50.     In the case of Sure Secure, however, the SBA regulations required even more. The operating agreement for Sure Secure included a number of decisions for which it required

the consent of a supermajority of the voting membership units—that is, votes equal to 66 percent of the ownership of the Company.

51.     SBA regulations required that Sure Secure certify that Ali owned a sufficient percentage of the Company so that she controlled all votes by the managers, including those votes that required a supermajority (66 percent) under the terms of the Company's then-current operating agreement.

52.     After the conversion of phantom membership units held by Kamran and other members in March 2014, Sure Secure was obligated to report its new ownership structure to the SBA and to reaffirm that Ali owned and controlled a sufficient ownership interest in the Company to control its decisions, including those that required a supermajority (66 percent).

53.     On information and belief, after the conversion of those units in March 2014, Ali purposely failed to cause Sure Secure to notify the SBA of the changes in its ownership structure and to inform the SBA that Sure Secure no longer met the SBA qualifications for preferential status.

54.     Instead, on information and belief, Ali caused Sure Secure to falsely certify to the SBA one or more times during the period after March 2014 that she still had the requisite ownership stake and control in Sure Secure despite the fact Ali no longer controlled at least 66 percent of the voting stake in Sure Secure.

55.     Ali and Hussain repeatedly cited the risk of SBA non-compliance as the reason why Ali was not reporting the true ownership of Sure Secure. Yet, in its tax reporting from 2012 through 2016, Sure Secure reported a percentage ownership for Ali that was less than 66 percent. Therefore, even based on those figures—which did not report Kamran's true ownership stake--

Sure Secure was out of compliance with SBA requirements for Section 8(a) or EDWOSB set-asides.

56.     In June 2014, Sure Secure was awarded a prime contract with the National Aeronautics and Space Administration (NASA), and in September 2014, Sure Secure was awarded a prime contract with the U.S. Army. Both of these contracts were awarded to Sure Secure as set-asides based upon its false certifications to the SBA about Ali's ownership and control.

57.     At the time that Sure Secure was awarded those contracts, Ali no longer held a sufficient percentage of the equity membership units in Sure Secure to certify accurately that she "owned" and "controlled" Sure Secure.

58.     Under its terms, participation in the Section 8(a) program is limited to nine (9) years. Following Sure Secure's "graduation" from the Section 8(a) program in 2019, Ali continued to cause Sure Secure to certify to the SBA and in its reporting that it is an Economically Disadvantaged Woman-Owned Small Business (EDWOSB), and thus was qualified to bid on certain contracts set aside for such businesses.

59.     Sure Secure's certification as an EDWOSB—like its certification in the Section 8(a) program—required that Ali own at least 66 percent of the voting membership units in the Company because of the supermajority vote provisions in the Company's operating agreement. On information and belief, Ali caused Sure Secure to certify this fact falsely during a period in which she no longer owned 66 percent of the voting membership units and the operating agreement still included multiple decisions that required a supermajority (66 percent).

60.     Sure Secure also filed tax returns with the Internal Revenue Service that inaccurately reflected the percentage of ownership held by each of its members.

61.     As a limited liability company with an S-Corp election, all of Sure Secure's profits and losses are passed through to the members in proportion to the percentage of each member's ownership interest. Each year, Sure Secure files Form K-1s with the Internal Revenue Service reflecting those proportional pass-throughs.

62.     In early 2015, Ali instructed Sure Secure's accountants to submit its 2014 tax return, including Form K-1s for each of the members that failed to reflect the conversion of the phantom membership units that had occurred during the calendar year 2014. Those Form K-1s did not accurately reflect the percentage of membership units in Sure Secure owned by each of its members.

63.     Specifically, those Form K-1s overstated the percentage of membership units in Sure Secure owned by Ali. In fact, at the time that Sure Secure filed its 2015 tax returns, Sure Secure's members held the following percentage interests: Ali held 52.88%; Kamran held 38.22%; Hussain held 4.71%. Ali's ownership percentage had been reduced below 66 percent in March 2014 when phantom membership units held by Kamran and other members converted into equity membership units.

64.     By misrepresenting Sure Secure's ownership, Ali has helped herself to more than her allocable share of the Company's profits and losses, and artificially diminished Kaman's allocable share in ratable fashion.

65.     Ali promised to amend the prior inaccurate filings (with the SBA and the Service) to reflect the Company's actual ownership following a Members' meeting.

66.     In or around March 2015, Ali agreed to have a Members' meeting to address various issues then pending relating to membership units in the Company, the loans held by Kamran, and overall forward business development strategy. The agenda was provided by email

and after review, Kamran objected in writing to both the agenda for the Members' meeting and the manner in which it had been called.

67.     On or around March 12, 2015, Kamran emailed a demand to Ali for immediate action pertaining to the payment of principal and interest due and owing to him since March 20, 2014, and the correction of the phantom units and ownership units reported to various government entities.

### Termination of Kamran's Employment

68.     To prevent the Company and the Members from discussing the outstanding issues, on March 16, 2015, Ali caused Sure Secure to wrongfully terminate Kamran's employment, purportedly for cause despite no grounds for such a termination.

69.     On or about June 12, 2015, Sure Secure issued a notice that it would redeem all of Kamran's units, including his phantom units. The notice acknowledged that Kamran was awarded phantom units under the Equity Compensation Plan and that the phantom units should have converted to equity units.

70.     By causing Sure Secure to terminate Kamran purportedly "for cause," Ali was attempting to trigger an "Option Event" pursuant to § 8.03 of the Amended and Restated Operating Agreement, whereby the Company would have the option to purchase the Member's shares upon termination of a Member's employment "for cause."

### The 2015 Settlement Agreement

71.     On or about September 1, 2015, Sure Secure and all of its members entered into an agreement to settle some of the outstanding disputes involving Kamran, captioned as a "Reconciliation Resolution," that reinstated Kamran's employment and abandoned the effort to

force him to sell his interest in the Company (the "2015 Settlement Agreement"). A copy of the 2015 Settlement Agreement is attached as **Exhibit 1**.

72.     The 2015 Settlement Agreement purported to resolve outstanding employment, compensation, and equity disputes between Sure Secure and Kamran, including the termination of his employment and disputes regarding the number of membership units he and other members of Sure Secure owned.

73.     Specifically, the 2015 Settlement Agreement provided that Kamran would retain his ten (10) voting units and sixty-three (63) phantom units, all of which would thereafter be accurately reported to appropriate government entities.

74.     In addition, the 2015 Settlement Agreement stated Sure Secure's and its members' intent to enter into other agreements to advance a "New Strategic Plan." The New Strategic Plan aimed to increase Kamran's and Hussain's ownership interests, modify the Company's management and other governance structures, and settle all prior disputes among the members.

75.     Specifically, in the 2015 Settlement Agreement, the parties agreed to negotiate diligently and in good faith to execute a management agreement to support the Company's pursuit of the New Strategic Plan.

76.     In fact, prior to the execution of the 2015 Settlement Agreement, Ali, Hussain and Kamran had already engaged in lengthy and detailed negotiations that resulted in an agreed-upon management agreement in the form of a highly detailed outline of planned changes in the structure and governance of Sure Secure to ensure future growth and maximum returns to all of the owners.

77.     The management agreement included a plan for reporting Kamran's phantom units that had converted to equity membership units, and for repayment—either in cash or through conversion to additional membership units—of Kamran's outstanding loans to the Company. This plan was designed to fulfill the promise in the 2015 Settlement Agreement.

78.     Thereafter, Sure Secure directed an attorney to draft the legal agreements that would be necessary in order to effect the changes contemplated by the management agreement, including the proper reporting of Kamran's 63 phantom units to equity membership units that converted in March 2014.

79.     In or about 2016, Ali and Hussain proposed that Sure Secure and its members avoid the expense of outside attorneys by working to effect the plan set forth in the management agreement without the assistance of outside counsel.

### Ali and Hussain Conspired to
### Prevent Recognition of Kamran's Ownership

80.     In or around 2015, Ali and Hussain discussed with Kamran the possibility that Sure Secure could change its certification with the SBA Section 8(a) program by relying not only on Ali's status as a disadvantaged person based on her ethnicity, but also relying upon Kamran's status as a disadvantaged person based on his ethnicity since he is from the same country as Ali. Taking into account the equity membership units that Kamran had acquired through conversion from phantom units, Ali and Kamran together owned and controlled a supermajority of Sure Secure's ownership interests, and could therefore qualify the Company for continued Section 8(a) status under the Sure Secure Operating Agreement.

81.     In or around early 2016, Ali purportedly met with officials at the SBA. Ali told Kamran that she intended to discuss with them this contemplated change in the way in which Sure Secure certified its qualification for the Section 8(a) program. Although Kamran had

customarily accompanied Ali to meetings with the SBA during his tenure with Sure Secure, Ali did not take Kamran to this meeting with her.

82.     Following the SBA meeting, Ali told Kamran that SBA officials had told her that Sure Secure would not be permitted to use both her ethnic status and Kamran's ethnic status as a disadvantaged person to satisfy the certification for preferential status.

83.     Ali told Kamran that she would find another way to report Kamran's true ownership, and stated that, in the meantime, they would work as if Kamran already had the 63 additional equity membership shares he had acquired through conversion in March 2014.

84.     Subsequently, in 2016, Ali and Hussain told Kamran that they would postpone the reporting of his additional 63 equity membership shares until the Company's "graduation" from the Section 8(a) program anticipated in February 2019, and promised that his ownership of those shares would be recognized at that time in a way that all his losses of his true ownership since 2014 would be corrected.

85.     This assertion by Ali and Hussain to continue to stall was part of their scheme and conspiracy to prevent Kamran from enjoying the financial and other benefits to which he was entitled as a more than 36 percent owner of the Company (which does not include additional units awarded to Kamran and unjustifiable units awarded to other Members).

86.     Moreover, Ali and Hussain attempted to dilute Kamran's ownership interest by unjustifiably and improperly awarding Hussain additional units to which he was otherwise not entitled.

87.     In addition, without justification, from 2015 through 2019, Hussain received monthly compensation of approximately $160,000 for participating in weekly "board meetings."

However, Kamran did not receive this same compensation for the same participation in those board meetings.

### *Sure Secure's Grant Letter and its Fraud on the SBA*

88.     In or around September 2016, after discussion with Kamran and Hussain, Ali (who was then the sole manager of Sure Secure) caused Sure Secure to pass a resolution authorizing Sure Secure to issue a gross cash bonus to Kamran of $226,983.96  (which, without taxes and other adjustments netted out to $124,320) for his past work on behalf of, and dedication and contributions to, Sure Secure.  Thereafter, Ali caused Sure Secure to issue a letter stating that the company had decided to give the bonus "not as a cash award but as units in the company after getting an approval from the SBA" and would grant 11.67 units to Kamran in lieu of a cash payment of the bonus. These additional membership units were in addition to, and not a part of, the converted phantom membership units that Kamran had earlier acquired. A copy of that letter, which was countersigned by Kamran, is attached as **Exhibit 2.**

89.     Ali updated Secure Secure's operating agreement to reflect Kamran's 11.67 additional units. A copy of the operating agreement exhibit A is attached as **Exhibit 3**.

90.     Because Sure Secure was required to obtain the SBA's consent to any such change in ownership of the Company, on or about August 6, 2017, Ali submitted an "Explanation of Why Change of Ownership is Requested From SBA" (the "2017 Letter to the SBA") and requested approval from the SBA to issue Kamran 11.67 additional units. In her letter, Ali asserted that the grant of these additional units would give Kamran a total of 21.67 membership units, constituting a 25.29 percent ownership interest in the Company. In doing so, she omitted mention of Kamran's additional equity membership units that he had acquired by the conversion of phantom equity units in March 2014, and that she has previously acknowledged.

91.     On May 17, 2018, the request to award additional equity membership units to Kamran was approved by the SBA. A copy of that letter is attached as **Exhibit 4**.

92.     Although the SBA had never been informed that Kamran already owned 63 units, this award (which was cumulative to Kamran's then-owned units) meant that the SBA approved Kamran owning at least a 25.29 interest in May 2018.  Necessarily, this meant that  Ali's ownership interest then fell below 66% (based on the information actually provided to the SBA).

93.     Despite the SBA's approval, Sure Secure has never given Kamran the benefits attendant to these additional units, nor has Sure Secure ever paid the $226,983.96 gross cash value of the bonus to Kamran.

94.     Ali and Hussain enriched themselves by their wrongful conduct, to Kamran's detriment.  While they have enjoyed benefits of ownership well in excess of their actual interests, Kamran's benefits of ownership have been artificially suppressed.

### *Sure Secure's Termination of Kamran's Employment*

95.     Throughout 2019, Kamran repeatedly expressed concerns to Ali and Hussain that the failure to disclose the actual percentage of ownership held by each of Sure Secure's owners in Sure Secure's filings with the SBA and/or other government agencies could expose Sure Secure to liability—specifically, for actions that would constitute violations of the False Claims Act, 31 U.S.C. § 3729, et seq.

96.     Despite Kamran's concerns, Sure Secure failed to inform the SBA and/or other government agencies of the actual percentage of ownership.

97.     On or about December 30, 2019, Sure Secure notified Kamran that effective December 31, 2019, his employment with Sure Secure would be terminated.

98.     On information and belief, Sure Secure terminated Kamran as retaliation for raising concerns that Sure Secure was filing submissions with the Small Business Administration and the IRS that failed to disclose Sure Secure's "true ownership," to use a phrase adopted by Ali herself during this period.

## COUNT ONE
### Breach of Contract – 2015 Settlement Agreement
### (Against All Defendants)

99.     Kamran restates and incorporates Paragraphs 1 through 98 above as if each had been fully set forth herein.

100.    The 2015 Settlement Agreement is a valid and binding contract under applicable law.

101.    In the 2015 Settlement Agreement, Sure Secure, Ali, Hussain, and the other members of the Company promised to restore Kamran's employment, compensation, and afford him the benefits associated with his then-vested ownership in the Company.  But that has never happened.

102.    Sure Secure has never distributed Kamran's true allocable share of profit to him, nor allocated his true share of losses.  And, in consistent fashion, its tax returns have always understated his ownership and overstated Ali's and Hussain's.

103.    In addition to the obvious economic impacts, this scheme as artificially diluted Kamran's voting power in the Company, particularly in light of the supermajority provision in the Sure Secure operating agreement.

104.    As a result of the Defendants' material breach of the 2015 Settlement Agreement, Kamran has suffered financial damages in an amount of not less than $41,475.64 from Defendants' failure to accurately report his ownership interest. Specifically, if not for

Defendants' breach, Kamran would have received the following additional distributions: $9,670.25 for the 2015 tax return; $2,123.57 for the 2016 tax return; $1,916.10 for the 2017 tax return; and $27,765.72 for the 2018 tax return. In the alternative, Kamran has suffered financial damages in an amount of not less than $829,833.75 plus interest since March 17, 2010. This amount is based upon the compensation that Kamran either deferred or earned under the Deferred Compensation Agreement and the Equity Compensation Plan for which he should have, but did not, receive full recognition of his equity membership shares.

**COUNT TWO**
**Breach of Contract – Grant Letter**
**(Against Defendant Sure Secure)**

105.    Kamran restates and incorporates Paragraphs 1 through 104 above as if each had been fully set forth herein.

106.    The Grant Letter is a valid and binding contract under applicable law.

107.    Under the Grant Letter, in recognition of Kamran's dedication and contributions to the Company, Sure Secure agreed to issue a bonus in the gross amount of $226,983.96 to Kamran, and to grant him 11.67 units upon receipt of approval by the SBA in lieu of paying the bonus in cash.

108.    On May 17, 2018, the SBA approved the issuance of those units. As such, all conditions were met for awarding the units.

109.    As with his original 73 units, and despite the SBA's approval, Sure Secure has never treated Kamran as the owner of these bonus units.

110.    Sure Secure's tax returns have never reported the units issued by the Grant Letter. And, upon information and belief, Ali intends to cause Sure Secure to file another fraudulent tax return for 2019 that does not include these grants or any of Kamran's other vested ownership.

111.    Sure Secure's actions have deprived Kamran of the economic and other benefits attendant to his true ownership.

112.    As a result of Sure Secure's material breach of the Grant Letter, Kamran has suffered significant financial damages in an amount of not less than $226,983.96, plus interest since May 2018.

**COUNT THREE**
**Civil Conspiracy Pursuant to Va. Code § 18.2-500**
**(Against Defendants Ali and Hussain)**

113.    Kamran restates and incorporates Paragraphs 1 through 112 above as if each had been fully set forth herein.

114.    Kamran had a property interest in the vested equity membership units to which he was contractually entitled under his agreements with Sure Secure.

115.    Defendants Ali and Hussain, with full knowledge of Kamran's true ownership interest in the Company, willfully or maliciously, entered into a conspiracy to deprive Kamran of the benefits of that ownership and enrich themselves in the process.  Among other things, they have exerted control over Sure Secure to ensure that Kamran does not receive the appropriate distributions and falsely reported Kamran's (and their own) ownership to the SBA and the Service.

116.    In 2016, Ali and Hussain told Kamran that they would postpone the reporting of his additional 63 equity membership shares until the Company's "graduation" from the Section 8(a) program anticipated in February 2019, and promised that his ownership of those shares would be recognized at that time in a way that all of his losses of his true ownership since 2014 would be corrected.

117.    This assertion by Ali and Hussain to continue to stall was part of their scheme and conspiracy to prevent Kamran from enjoying the financial and other benefits to which he was entitled as a more than 36 percent owner of the Company (which does not include additional units awarded to Kamran and unjustifiable units awarded to other Members).

118.    Ali and Hussain further conspired to dilute Kamran's ownership interest by unjustifiably awarding Hussain equity units that he was not entitled to. Moreover, from 2015 through 2019, Hussain received compensation of $160,000 for the period 2016 through 2019 for participating in weekly "board meetings."

119.    As a result of the conspiracy, the Defendants Ali and Hussain have been able to take larger distributions based on the inaccurate ownership reporting and borrow excess money and exclude Kamran from key decision making to Kamran's detriment in violation of the supermajority in the operating agreement.

120.    The acts of conspiracy constituted improper methods, including conspiring to make false representations to Kamran so he would perform work and increase Sure Secure's valuation and make significant financial loans to Sure Secure.

121.    The concerted actions of Defendants were willful, malicious, intentional, and without justification.

122.    Defendants' conduct has resulted in an injury to Kamran's business interests, within the meaning of Virginia Code § 18.2-499. Pursuant to Virginia Code § 18.2-500, Defendants are liable for treble damages, the costs of this suit, and reasonable attorneys' fees incurred by Kamran.

123.    As a direct and proximate result of the Defendants' actions, Kamran has been damaged in an amount not less than $41,475.64, plus interest, which amount should be trebled in

awarding damages under this claim, from Defendants' failure to accurately report his ownership interest. Specifically, if not for Defendants' conspiracy, Kamran would have received the following additional distributions: $9,670.25 for the 2015 tax return; $2,123.57 for the 2016 tax return; $1,916.10 for the 2017 tax return; and $27,765.72 for the 2018 tax return.  In the alternative, Kamran has suffered financial damages in an amount of not less than $1,056,817.71 plus interest since March 17, 2010. This amount is based upon the compensation that Kamran either deferred or earned under the Deferred Compensation Agreement and the Equity Compensation Plan for which he should have, but did not, receive full recognition of his equity membership shares and the bonus awarded under the Grant Letter.

**COUNT FOUR**
**Violation of Va. Code § 40.1-29**
**(Against Defendant Sure Secure)**

124.    Kamran restates and incorporates Paragraphs 1 through 123 above as if each had been fully set forth herein.

125.    On or about December 30, 2019, Sure Secure terminated Kamran's employment effective December 31, 2019.

126.    Virginia Code Section 40.1-29 provides that, "[u]pon termination of employment, an employee shall be paid all wages or salaries due him for work performed prior thereto; such payment shall be made on or before the date on which he would have been paid for such work had his employment not been terminated."

127.    During the course of his employment with Sure Secure, Kamran did not receive the full compensation due and owing to him in that Sure Secure awarded Kamran a bonus in the gross amount of $226,983.96, but neither recognized the award of 11.67 units in lieu of that cash payment nor paid that cash amount to Kamran.

128.    As such, Sure Secure has not paid Kamran those sums due and owing for work he performed prior to the termination of his employment.

129.    Sure Secure acted willfully and knowingly in declining to pay Kamran the full compensation due and owing to him upon the termination of his employment.

130.    As a result of Sure Secure's violation of Virginia law, Kamran has suffered at least $226,983.96 in damages. Pursuant to Virginia Code section 40.1-29(J), Kamran is entitled to recover an amount equal to triple the amount of wages due (or, alternatively, the amount of wages due plus liquidated damages equal to the amount of unpaid wages, as well as pre-judgment interest) plus reasonable attorneys' fees and costs.

**COUNT FIVE**
**Retaliation in Violation of 31 U.S.C. § 3730(H)**
**(Against Defendant Sure Secure)**

131.    Kamran restates and incorporates Paragraphs 1 through 130 above as if each had been fully set forth herein.

132.    Kamran repeatedly expressed concerns to Ali and Hussain that the failure to disclose the actual percentage of ownership held by each of Sure Secure's owners in Sure Secure's filings with the Small Business Administration and/or other government agencies could expose Sure Secure to liability—specifically, for violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

133.    On information and belief, Sure Secure was aware, before terminating Kamran on or around December 30, 2019, that he had expressed such concerns and that the company could be exposed to liability under the False Claims Act if it failed to disclose what Kamran, Ali and Hussain referred to in their email correspondence as "true ownership."

134.   On information and belief, Sure Secure terminated Kamran as retaliation for raising concerns that Sure Secure was filing submissions with the Small Business Administration and the IRS that failed to disclose Sure Secure's "true ownership."

135.   The termination of Kamran for raising such concerns constitutes unlawful retaliation for protected activity, in violation of 31 U.S.C. § 3730(h).

136.   As a result of Sure Secure's unlawful retaliation, Kamran has suffered damages at least $200,000 in lost wages and benefits. Pursuant to 31 U.S.C. section 3730(h)(2), Kamran is entitled to reinstatement, two times the amount of back pay he has lost, interest on such back pay, and the costs of this litigation, including reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Kamran respectfully prays that this Court enters the following relief:

A.   Compensatory damages to be proven at trial for Count I against each of the Defendants, jointly and severally, in an amount of not less than $41,475.64, or, in the alternative, $829,833.75 plus interest since March 31, 2014;

B.   Compensatory damages to be proven at trial for Count II against Defendant Sure Secure, in an amount of not less than $226,983.96, plus interest since May 2018;

C.   Compensatory damages to be proven at trial for Count III against Defendants Ali and Hussain, jointly and severally, in an amount not less than $41,475.64, or, in the alternative $1,056,817.71, plus interest, and trebled;

D.   An award of the costs of this suit as well as reasonable attorneys' fees incurred by Kamran for Count III against Defendants Ali and Hussain, jointly and severally; and

E.   Compensatory damages for Count IV against Defendant Sure Secure, in an amount not less than $226,983.96, plus interest since December 2019, trebled; and

F.      An award of the costs of this suit as well as reasonable attorneys' fees incurred by Kamran for Count IV against Defendant Sure Secure; and

G.      Compensatory damages for Count V against Defendant Sure Secure, in an amount not less than $200,000 plus interest, and doubled;

H.      An award of the costs of this suit as well as reasonable attorneys' fees incurred by Kamran for Count V against Defendant Sure Secure; and

I.      A permanent injunction restraining the Defendants from making any further false statements to any government agency or private third party regarding the percentage of Sure Secure owned by each of its members;

J.      Such further relief, legal and equitable, that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Adam Kamran hereby demands a trial by jury for the foregoing claims against the Defendants that are triable by a jury.

Dated: November 10, 2020

_____*Amber Orr*_____
Declan Leonard, VSB No. 40292
David B. Deitch, VSB No. 74818
Amber Orr, VSB No. 93702
BERENZWEIG LEONARD, LLP
8300 Greensboro Drive, Ste. 1250
McLean, VA 22102
Telephone: (703) 760-0402
Facsimile: (703) 462-8674
dleonard@berenzweiglaw.com
ddeitch@berenzweiglaw.com
aorr@berenzweiglaw.com
*Counsel for Plaintiff Adam Kamran*

# EXHIBIT 1

## SURE SECURE SOLUTIONS, LLC

### JOINT WRITTEN CONSENT
### OF
### THE BOARD OF MANAGERS
### AND
### THE MEMBERS

The undersigned, being the Board of Managers (the "Board of Managers") and all of the members (the "Members") of Sure Secure Solutions, LLC, a Virginia limited liability company (the "Company"), acting by this Joint Written Consent of the Board of Managers and the Members, dated as of September 1, 2015 (the "Consent"), in accordance with Section 13.1-1024(I) and Section 13.1-1022(E) of the Virginia Limited Liability Company Act and Section 5.11 and Section 4.08 of the Amended and Restated Operating Agreement of the Company, effective March 16, 2010, as amended (the "Operating Agreement") do hereby waive all notice of the time, place and purposes of a special meeting of the Board of Managers and the Members and do hereby consent, with not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting, to the adoption of the following recitals and resolutions with the same force and effect as if they had been adopted at a duly convened special meeting of the Board of Managers and the Members.

### Reconciliation with Kamran and Restoration of Kamran's Status with the Company

WHEREAS, the Company had a prior strategic plan (the "Prior Strategic Plan") and based on the operation of the Prior Strategic Plan, certain disagreements and conflicts arose among certain  Members;

WHEREAS, in order to further implement the Prior Strategic Plan, on March 16, 2015, Narjis Ali ("Ali"), in her capacity as President, CEO/Managing Member of the Company sent a letter to Adam Kamran ("Kamran") notifying Kamran that his employment with the Company was being terminated for cause, effective immediately (the "Termination Letter");

WHEREAS, on June 12, 2015, the Members held a meeting in which Ali, Mohsin Hussain ("Hussain"), James Butler, Murali Raju, Ahmed Afzal, and Hamid Bacha authorized and approved the Company's exercise of its option to redeem all of Kamran's Units (as defined in the Company's operating agreement, effective March 16, 2010, as amended (the "Operating Agreement")) and Phantom Units (as defined in the Operating Agreement), as permitted under the Operating Agreement;

WHEREAS, Kamran disputed both his termination and the Company's attempted redemption of his Units and Phantom Units and therefore did not accept any payment made by the Company to Kamran in connection with the Company's exercise of its option to redeem all of Kamran's Units and Phantom Units;

WHEREAS, after June 12, 2015, the Members determined it to be advisable and in the best interests of the Company to move in a new direction and replace the Prior Strategic Plan with a new strategic plan, the initial steps of which are more fully specified in these resolutions,

including restoring Kamran to his pre-March 16, 2015 position with the Company (the "New Strategic Plan"),

NOW, THEREFORE, BE IT RESOLVED, that the Company and the Members (i) hereby agree to reconcile with Kamran and to restore Kamran to Kamran's pre-March 16, 2015 status with the Company, and (ii) hereby rescind and unwind and void *ab initio* all prior acts and actions relating to Kamran's separation from the Company, including, without limitation, the Company's issuance of the Termination Letter and the Company's exercise of its option to redeem all of Kamran's Units and Phantom Units; and be it

FURTHER RESOLVED, that each of Kamran's employment and ownership status with the Company be and hereby is restored (the "Kamran Restoration"), in all material respects, to its status as of March 15, 2015 (i.e. the day immediately preceding the date of the Termination Letter), with an effective date of March 16, 2015 for the avoidance of doubt, the Kamran Restoration shall and hereby does include, but is not limited to, Kamran's title and compensation package.

## No Admission of Liability and Release of Claims

WHEREAS, in furtherance of the reconciliation with Kamran and restoration of Kamran's status with the Company, the Company and the Members desire to address admission of liability and release of claims matters, as detailed below;

NOW, THEREFORE, BE IT RESOLVED, that the Company and the Members hereby acknowledge that (a) these resolutions are/were agreed upon as a compromise and settlement of disputed claims and that these resolutions are not, and may not be construed as, an admission by the Company or any Member, or their respective agents or representatives, of liability, wrongdoing, or a violation of any law, and (b) the Company and the Members specifically disclaim and deny (i) any liability to any other party hereto and (ii) engaging in any wrongful, tortious, or unlawful activity; and be it

FURTHER RESOLVED, that the Company and the Members hereby acknowledge and agree that it/they do not have any actual or potential claim or basis for making or the right to make any claim of any kind against the Company or any Member, and hereby release and discharge the Company and each Member, individually and collectively, from any actual or potential claim of any kind the Company or the Members have, had or may have now against the Company or any Member, as the case may be.

## Intent to Enter Into Other Agreements to Advance the New Strategic Plan; Rescission

WHEREAS, in furtherance of the reconciliation with Kamran and restoration of Kamran's status with the Company, the Company and the Members intend to enter into other agreements to advance the New Strategic Plan and desire to address the potential rescission of these resolutions, as detailed below, in the event these other agreements do not come to fruition.

NOW, THEREFORE, BE IT RESOLVED, that from and after the date of this Consent, the Members shall diligently and in good-faith negotiate the terms of one or more other

agreements among the Company and the Members, including a master strategic plan agreement in order to implement the next steps of the New Strategic Plan; and that the negotiations and terms of one or more other agreements shall include, but not be limited to: (i) subject to approval of the U.S. Small Business Administration (the "SBA") under the rules and regulations of the SBA's 8(a) program, increasing each of Kamran's and Hussain's ownership interest in the Company; (ii) modifying the Company's management and other governance structures; and (iii) settling all prior disputes among the Members, including but not limited to those relating to the Prior Strategic Plan and Kamran's separation from the Company, as specified above; and be it

FURTHER RESOLVED, that the Company and the Members hereby acknowledge and agree that entering into the agreements referenced in the preceding resolution is a material inducement to the execution and delivery of these resolutions and a condition subsequent to the consummation of the transactions contemplated hereunder, and in the event the Company and the Members fail to approve by the affirmative vote of the Members holding a Supermajority (as defined in the Operating Agreement) of the Units and therefore do not enter into the agreements referenced in the preceding resolution, any of the Company, Ali, Kamran, or Hussain shall have the right, in its/her/his sole discretion, to automatically and unconditionally rescind these resolutions; and that if any of the Company, Ali, Kamran, or Hussain exercises its/her/his rescission right under this resolution, this Consent and these resolutions shall be null and void *ab initio*, and these resolutions shall be of no force and effect from the outset.

**Miscellaneous**

FURTHER RESOLVED, that the Members agrees to keep the terms and fact of this Consent and these resolutions completely confidential, except as may be required by law or legal process, or as the Members may reveal to their respective legal, financial and tax advisors or, in the case of the Company, to its employees who have a need to know the terms of these resolutions in order to implement its terms; and be it

FURTHER RESOLVED, that this Consent and these resolutions shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns; and be it

FURTHER RESOLVED, that the invalidity or unenforceability of any provision of this Consent and these resolutions shall not affect the validity or enforceability of any other provision of these resolutions; and be it

FURTHER RESOLVED, that in addition to any and all other remedies that may be available at law in the event of any breach of this Consent and these resolutions, each party shall be entitled to specific performance of the agreements and obligations of the other parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction; and be it

FURTHER RESOLVED, that this Consent and these resolutions constitute the entire understanding of the parties with respect to the subject matters hereof and supersedes all prior agreements and understandings relating to such subject matters; and be it

FURTHER RESOLVED, that this Consent may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same document and this Consent may be executed by facsimile or pdf signatures; and be it

FURTHER RESOLVED, that the section headings of this Consent and these resolutions are for the convenience of the parties and in no way alter, modify, amend, limit, or restrict the obligations of the parties; and be it

FURTHER RESOLVED, that the officers of the Company (or any other person designated and authorized thereby), acting in the name and on behalf of the Company, be, and they hereby are, severally authorized, empowered, and directed to do and perform all such further acts and things, to execute and deliver in the name of the Company, and where necessary or appropriate, to file with the appropriate governmental authorities, all such further agreements, certificates, instruments, or other documents as in their judgment shall be necessary or advisable from time to time in order to effectuate the intent and purposes of the foregoing resolutions and any and all of the transactions contemplated therein; and be it

FURTHER RESOLVED, that any and all lawful actions taken prior to the date hereof by any of the officers of the Company, acting in the name and on behalf of the Company, or any other authorized agent or representative of the Company acting within the scope of authority in the name and on behalf of the Company, in connection with the matters contemplated by the foregoing resolutions, be, and hereby are, severally ratified, confirmed and adopted as the acts and deeds of the Company; and be it

FURTHER RESOLVED, that the officers of the Company be, and they hereby are, severally authorized, empowered and directed to place a copy of these resolutions in the minute book of the Company.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

4

**IN WITNESS WHEREOF**, the Board of Managers and the Members have caused this Consent to be executed as of the date first written above.

**BOARD OF MANAGERS:**

09/01/2015

By: Narjis Ali, Managing Member

**MEMBERS**:

NARJIS ALI

NARJIS ALI, Individually

ADAM KAMRAN

ADAM KAMRAN, Individually

MOHSIN HUSSAIN

MOHSIN HUSSAIN, Individually

JAMES BUTLER

JAMES BUTLER, Individually

MURALI RAJU

MURALI RAJU, Individually

5

# EXHIBIT 2



1984 Isaac Newton Square West
Suite 202
Reston VA 20190
Tel: 571-375-2440
www.suresecuresolutions.com

**PROPOSED SURE SECURE UNITS GRANT LETTER**
**(PENDING SBA APPROVAL)**

Date:   September 30, 2017

To:    Adam Aabid Kamran
       1348 Red Hawk Circle
       Reston, VA 20194

Sure Secure Solutions, LLC, a Virginia limited liability company ("**Company**"), in recognition of your seven and a half years of outstanding service, dedication, commitment and continued hard work has elected to award to you a bonus. Your contributions in the areas of Business Development, Financial and Strategic planning and guidance, and building the company infrastructure and operations as the Vice President are truly appreciated.

The bonus will be given to you for your exemplary service since March 2010, in the net amount of $124,320.00 after payment of all applicable individual and company taxes, the gross amount will be determined accordingly. The company has further decided to give the bonus not as a cash award but as units in the company after getting an approval from SBA. The company will use the September 2016 valuation, which determined the discounted price of a single Sure Secure unit to be $10,652.84. Using this methodology, the units granted in lieu of the cash amount will be 11.67 units. The total number of units you will own once approved by the SBA will be 10 (existing) + 11.67 = 21.67 units. This constitutes a total of 25.29% ownership of the company.

On behalf of Sure Secure and as the Managing Member, I would like to take this opportunity to congratulate you on this award of an increased equity in the company. You truly deserve this award and we hope to continue building the company with your help and support.

Wishing you the very best.

                    SURE SECURE SOLUTIONS, LLC:

                    By: _____ (SEAL)
                    Name: Narjis Ali
                    Title: President
                    Date: September 30, 2017

                    **SEEN AND ACKNOWLEDGED:**

                    _____ (SEAL)
                    Name: Adam Aabid Kamran
                    Date: September 30, 2017

# EXHIBIT 3

**SURE SECURE SOLUTIONS, LLC**      **OPERATING AGREEMENT**
**OWNERSHIP Percentage**      **EXHIBIT A 2017**

| MEMBER NAME | Percentage |
|---|---|
| Narjis Ali | 59.53% |
| Adam Kamran | 25.29% |
| Mohsin Hussain | 11.67% |
| James Butler | 2.33% |
| Murali Raju | 1.17% |
| **TOTALS** | **100.00%** |

This is the updated Exhibit A
to the Sure Secure Operating Agreement
(Amended and Restated) effective March 16, 2010;
and the First Amendment to the Amended and
Restated Operating agreement dated March 31, 2010;
and the Second Amendment to the Amended
and Restated Operating Agreement dated
January 7, 2011.

The above ownership percentages include
the 5 single unit buybacks and is
contingent upon approval of additional
units grant to ADAM KAMRAN by SBA.

Narjis Ali    2/28/2018

# EXHIBIT 4



U.S. Small Business
Administration

antonio.doss@sba.gov | 202-205-8800 | www.sba.gov/dc
Washington Metropolitan Area District Office (WMADO) | 409 3rd St SW, Floor 2 | Washington, DC 20416

MAY 1 7 2018

Narjis Ali
Managing Member
Sure Secure Solutions, LLC
1984 Isaac Newton Square West
Suite 202
Reston, Virginia 20190

Dear Ms. Ali:

We have reviewed the documents submitted for Sure Secure Solutions, LLC's Change of Ownership. This letter
is to inform you that your request to change your ownership and management has been approved by the U.S.
Small Business Administration and is as follows:

| | |
|---|---|
| Narjis Ali | 59.53% |
| Adam Kamran | 25.29% |
| Moshin Hussain | 11.67% |
| James Butler | 2.33% |
| Murali Raju | 1.17% |

Please make sure that the changes are registered in the System for Award Management (SAM) and Dynamic
Small Business Search (DSBS) Profile, if applicable.

The Small Business Administration (SBA) will continue to be of service to you during your tenure in the
Section 8(a) Business Development (BD) Program. In addition, we wish you good fortune in all of your
entrepreneurial endeavors. If you have any questions, please feel free to contact Mr. Reginald Walden,
Business Opportunity Specialist, at 202-205-7547.

The U.S. Small Business Administration's Washington District Office would like to thank you for your
participation and wish you continued success in the 8(a) Business Development Program.

Sincerely,

Antonio Doss
District Director

*All SBA programs and services are extended to the public on a nondiscriminatory basis.*