IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ADAM KAMRAN, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 1:20-cv-1494 (RDA/MSN) |
| v. | ) |
| NARJIS ALI, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's Amended Complaint ("Motion"). Dkt. 7. Considering the Motion together with Defendants' Memorandum in Support (Dkt. 8); Plaintiff Adam Kamran's Opposition (Dkt. 10); and Defendants' Reply (Dkt. 11), it is hereby ORDERED that Defendants' Motion to Dismiss (Dkt. 7) is GRANTED IN PART and DENIED IN PART.

I. BACKGROUND

Plaintiff Adam Kamran is a Virginia resident, as are Defendants Narjis Ali and Mohsin Hussain.[1] Dkt. 1-1, ¶¶ 8, 10-11. Defendant Sure Secure is a limited liability company organized under Virginia law with a principal place of business in Reston, Virginia. *Id.* ¶ 9. A government contractor, the company "provides end-to-end information technology services to its federal customers," including "security services, web application development, and infrastructure/cloud architecture[.]" *Id.* Importantly, between 2010 and 2019, Sure Secure was certified by the Small Business Administration ("SBA") under the agency's Section 8(a) Small Disadvantaged Business

---

[1] According to the Amended Complaint, Defendant Hussain is Defendant Ali's son-in-law. Dkt. 1-1, ¶¶ 5, 11.

program. *Id.* Since 2010, the company has also been self-certified under the SBA's Disadvantaged Woman-Owned Small Business (EDWOSB) program. *Id.*

Plaintiff became a member/owner of Sure Secure in March of 2010, when he purchased nine equity membership units of the company and also became an employee of the company. Dkt. 1-1, ¶¶ 21, 23. Initially, Plaintiff held about 8.5 percent of the voting membership units of Sure Secure. *Id.* ¶ 21. Before Plaintiff, Defendant Hussain, and others purchased shares in 2010, Defendant Ali had been the sole owner of Sure Secure. *Id.* ¶ 17. Plaintiff also became an employee of Sure Secure on March 20, 2010. *Id.* ¶ 23.

Around the time Plaintiff joined Sure Secure as a member/owner and employee, Plaintiff executed two agreements outlining ways he might purchase or otherwise obtain additional membership shares in the company: (1) an Equity Compensation Plan; and (2) a Deferred Compensation Agreement. *Id.* ¶ 27. Under the Equity Compensation Plan, Sure Secure committed to award Plaintiff "phantom membership units," which the plan defined as "a right to receive a certain number of [u]nits on the [c]onversion date." *Id.* ¶ 29. The plan's conversion date was variable, as it keyed the conversion of Plaintiff's phantom units to equity membership units to the first of three dates: (1) a change in control, as defined in the Equity Compensation Plan; (2) an initial public offering by Sure Secure; or (3) March 31, 2014. *Id.* ¶ 31. When neither of these first conditions occurred, Plaintiff's twelve phantom units converted to equity membership units on March 31, 2014. *Id.* ¶ 34. That same date, Plaintiff was awarded an additional fifty-one phantom units under the terms of the Deferred Compensation Plan. *Id.* ¶ 43. Because Plaintiff had received one bonus membership unit in March of 2011, *id.* ¶ 44, by March 31, 2014, he owned seventy-three membership units in Sure Secure. *Id.* ¶ 45.

Following these changes in Sure Secure's ownership, the company "was obligated to report its new ownership structure to the SBA and to reaffirm that Ali owned and controlled a sufficient ownership interest in the Company to control its decisions[.]" *Id.* ¶ 52. This obligation resulted from SBA regulations requiring compliance with the agency's Section 8(a) program. *Id.* ¶¶ 48-51. Under the regulations, if a business is owned and controlled by a socially or economically disadvantaged person, the company must be unconditionally owned by the qualifying individual to receive certain SBA set-aside contracts. *Id.* ¶ 48. Sure Secure was such a business, as the company qualified for SBA's Section 8(a) program based on Defendant Ali's ethnicity. *Id.* ¶ 47. For limited liability companies like Sure Secure, SBA generally defines this unconditional-ownership threshold to mean the disadvantaged person must control at least 51 percent of every class of stock. *Id.* ¶ 49. Because Sure Secure's own operating agreement required a supermajority of voting membership units to approve certain decisions, though, the SBA's regulatory threshold for Sure Secure stood at 66 percent of the ownership of the company. *Id.* ¶¶ 50-51, 59.

Sure Secure, however, purportedly did not report any of the changes in its ownership structure to the SBA or other government entities, instead allegedly falsely certifying that Defendant Ali still maintained the necessary ownership and control of the company to qualify for SBA's set-aside contract program. *Id.* ¶¶ 53-54. In 2014, the company was awarded prime contracts with the National Aeronautics and Space Administration (NASA) and the United States Army, having obtained these set-aside contracts based on false certifications to the SBA about Sure Secure's ownership and control. *Id.* ¶ 56.

When Defendant Ali failed to amend the company's prior inaccurate filings, Plaintiff objected to her handling of the company's reconfigured ownership structure both in writing and at a members' meeting called in March of 2015. *Id.* ¶ 66. On March 12, 2015, Plaintiff emailed

Defendant Ali, demanding payment and interest for his full ownership shares he acquired as of March 31, 2014, and further demanding that the corrected ownership structure be reported to the appropriate government entities. *Id.* ¶ 67. Four days later, Plaintiff was terminated. *Id.* ¶ 68. The parties ultimately reached a resolution, however, and on September 1, 2015, Defendant Sure Secure and all of its members entered into a settlement agreement (the "2015 Settlement Agreement"). *Id.* ¶ 71. That agreement contained multiple provisions, including a provision stipulating that Plaintiff would retain his seventy-three membership units (sixty-three phantom units plus ten equity membership units), which Sure Secure would from there on out accurately report in its SBA certifications and other reports to government entities. *Id.* ¶ 73.

That was not the end of the SBA qualification saga, however. In 2015, Plaintiff discussed with Defendants Ali and Hussain his proposal to amend Sure Secure's SBA certification by relying on both Defendant Ali's ethnicity and his own status, "since he is from the same country as Ali." *Id.* ¶ 80. Defendant Ali allegedly told Plaintiff she would raise this potential change in her upcoming meeting with SBA officials in early 2016. *Id.* ¶ 81. But following that meeting, she informed Plaintiff that his dual-certification plan was rebuffed by SBA officials and that she would "find another way to report [Plaintiff's] true ownership." *Id.* ¶ 82. Also in 2016, Defendants Ali and Hussain allegedly told Plaintiff that they planned to delay the reporting of his phantom membership shares in the company until Sure Secure had passed the nine-year mark from the date of its certification in SBA's Section 8(a) program. *Id.* ¶ 84. The nine-year mark was significant because participation in the program is limited to nine years. *Id.* ¶ 58. According to Plaintiff, this was all part of Defendants' "scheme and conspiracy to prevent [hi] from enjoying the financial and other benefits to which he was entitled[.]" *Id.* ¶ 85.

In September of 2017, Defendant Sure Secure presented Plaintiff with a letter describing the company's plans to award Plaintiff a bonus, which he was promised in terms of additional Sure Secure ownership units in lieu of cash. *Id.* ¶ 88. On August 6, 2017, Defendant Ali wrote a letter to the SBA requesting approval to issue Plaintiff the promised additional ownership units, but she omitted Plaintiff's additional equity membership units in the company that he had acquired on March 31, 2014. *Id.* ¶ 90. The SBA approved the request on May 17, 2018. *Id.* ¶ 91.

Throughout 2019, Plaintiff repeatedly raised concerns with Defendants Ali and Hussain that the company's failure to accurately report Sure Secure's true ownership structure placed the business at risk of facing False Claims Act liability. *Id.* ¶ 95. Despite these concerns, Sure Secure purportedly never reported the details of its changed ownership structure to SBA. On December 30, 2019, Sure Secure informed Plaintiff that his employment with the company would be terminated the following day, December 31, 2019.

On June 9, 2020, Plaintiff filed an action in the Circuit Court of Fairfax County, Virginia. He amended his complaint on November 10, 2020. Dkt. 1-1. Defendants timely removed the action to this Court on December 4, 2020. In his Amended Complaint, Plaintiff brings five causes of action. He seeks to recover against all Defendants for breach of contract based on the 2015 Settlement Agreement (Count One), against Defendant Sure Secure for breach of contract based on the 2017 Bonus Letter (Count Two), against Defendants Ali and Hussain for civil conspiracy under Va. Code § 18.2-500 (Count Three), against Defendant Sure Secure for a violation of the Virginia Wage Payment Act, Va. Code § 18.2-500 (Count Four), and against Defendant Sure Secure for retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) (Count Five). Defendants have moved to dismiss all counts alleged in the Amended Complaint (Dkt. 7) for failure to state a claim.

## II. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. In considering a Rule 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *See E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Nevertheless, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). And "[g]enerally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb*, 791 F.3d at 508).

## III. ANALYSIS

### A. Breach of Contract – Settlement Agreement (Count One)

Plaintiff brings a claim for breach of contract, alleging that Defendants breached the 2015 Settlement Agreement when they failed to restore Plaintiff to the ownership status he held as of

March 15, 2015.  Dkt. 1-1, ¶¶ 99-104.  Plaintiff alleges he owned 73 equity ownership units as of that date, and that Defendants did not afford him the benefits of that ownership share after the parties executed the 2015 Settlement Agreement.  Under Virginia law, a breach of contract claim requires (1) a legally enforceable obligation of a defendant to a plaintiff; (2) breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.  *Filak v. George*, 267 Va. 612, 619 (2004).

In the Amended Complaint, Plaintiff plausibly alleges that he owned 73 equity ownership units on March 15, 2015.  Plaintiff owned ten equity ownership units before March of 2014.  And under the company's deferred compensation agreement and equity compensation plan, he had earned an additional sixty-three phantom ownership units, which he alleges were converted to equity ownership units on March 31, 2014.  Dkt. 1-1, ¶¶ 33-34, 41-42.

Furthermore, Plaintiff has plausibly pleaded that Defendant Sure Secure breached the 2015 Settlement Agreement because they failed to afford him the benefits he was due as full owner of 73 equity units.  Specifically, he alleges that were it "not for Defendants' breach, [Plaintiff] would have received the following additional distributions: $9,670.25 for the 2015 tax return; $2,123.57 for the 2016 tax return; $1,916.10 for the 2017 tax return; and $27,765.72 for the 2018 tax return."  Dkt. 1-1, ¶ 104.  Part of his argument appears to rest on an agreement to agree, which is plainly unenforceable under Virginia law.  *See, e.g.*, *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490 (E.D. Va. 2002) (acknowledging that it is "well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable"); *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514 (1997).  To the extent Plaintiff's contract claim seeks to enforce an obligation flowing from the contract's agreement-to-agree provision, he fails to state a claim upon which relief may be granted.  Plaintiff also seeks to recover based on breaches

7

of other contractual terms, however, and he identifies a legally enforceable obligation owed to him by Defendant Sure Secure in providing that Plaintiff "would retain his ten (10) voting units and sixty-three (63) phantom units," an apparent breach of that obligation, and specific damages resulting from that alleged breach. Dkt. 1-1, ¶¶ 73, 104. Consequently, he has plausibly pleaded a breach-of-contract claim as to Defendant Sure Secure.

Although Defendants emphasize that the terms of the 2015 Settlement Agreement repeatedly referenced 63 of Plaintiff's units as "phantom" units, Plaintiff explains that the Settlement Agreement took special care to refer to these ownership shares as phantom units because failing to do so would have been tantamount to admitting non-compliance with the SBA's Section 8(a) program. *Id.* ¶¶ 47-51, 57-59. SBA requires that the qualifying individual control all decisions in the company receiving the set-aside contract. *Id.* ¶ 51. As a result, Sure Secure needed to represent that Ms. Ali maintained a supermajority ownership in the company—even when, according to Plaintiff, his ownership of 73 units meant that Ms. Ali no longer held such a supermajority ownership. *Id.* ¶¶ 50-52. Had Sure Secure acknowledged otherwise in the 2015 Settlement Agreement, Plaintiff suggests, the company's SBA qualification might have been jeopardized. *Id.* ¶¶ 50, 52, 58-59.

Defendants forcefully contest this implication. At this stage of litigation, the Court cannot conclude that any breach of the 2015 Settlement Agreement occurred, but it must accept Plaintiff's well-pleaded allegations as true. Plaintiff's specific allegations rise above the level of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. In light of the mandate under Rule 12(b)(6), the Court finds that Plaintiff has plausibly alleged Defendant Sure Secure breached the 2015 Settlement Agreement and therefore declines to dismiss Count One of the Amended Complaint as to Sure Secure.

Defendants Ali and Hussain are differently situated, however. The Amended Complaint fails to identify which terms of the 2015 Settlement Agreement these particular individuals purportedly breached, and it does not articulate how they breached the contract's terms. *See generally* Dkt. 1-1. As this is Plaintiff's second pleading, he cannot convincingly assert that such failure is mere oversight. The Court therefore dismisses Count One as to Defendants Ali and Hussain with prejudice.

### B. Breach of Contract – Bonus Letter (Count Two)

Plaintiff also brings a second claim for breach of contract, alleging Defendant violated the terms of the September 2017 Bonus Letter he attached as an exhibit to the Amended Complaint when it failed to provide him a promised bonus. Dkt. 1-1, ¶¶ 105-12. Defendants argue this Bonus Letter was not a contract at all but was rather a gift for which Plaintiff gave no consideration. Dkt Nos. 8; 11.

The Court finds that the Bonus Contract was not an enforceable contract. There was no bargained-for consideration involved in Defendant Sure Secure's decision to promise Plaintiff a bonus. Instead, the promise was made after Plaintiff rendered services to the company, and as such was a unilateral election. *See* Dkt. 1-1 at 35 (writing that the company "has elected to award [Plaintiff] a bonus" in recognition of his "exemplary service since March 2010"). Having reviewed the Bonus Letter, the Court has not discerned any act or forbearance Plaintiff engaged in that might constitute valid consideration other than acts he would have ordinarily performed as a Sure Secure employee. Rather, the company promised Plaintiff the bonus in recognition of his past service. But such backward-looking gratuity is not bargained-for consideration sufficient to form a contract. Past consideration is no consideration. *See, e.g.*, *Sager v. Basham*, 241 Va. 227, 229-30 (1991) ("When, however, a service has been rendered before a promise was made, the prior service

9

is not a sufficient consideration to support the promise."); *Glascock v. Comm'r of Internal Revenue*, 104 F.2d 475, 477 (4th Cir. 1939) ("The rule in Virginia, with few exceptions, is that a past consideration which imposed no legal obligation at the time it arose will support no promise whatever."). Plaintiff's breach-of-contract claim based on the 2017 Bonus Letter therefore fails to state a claim upon which relief may be granted.

As a result, the Court dismisses with prejudice Count Two of the Amended Complaint as to all Defendants.

### C. Civil Conspiracy (Count Three)

In Count III of his Amended Complaint, Plaintiff alleges civil conspiracy pursuant to Va. Code § 18.2-500 against Defendants Ali and Hussain. Dkt. 1-1, ¶¶ 113-23. A plaintiff bringing this statutory claim of civil conspiracy must plausibly allege that "two or more persons" "combine[d], associate[d], agree[d], mutually undert[ook] or concert[ed] together for the purpose of . . . willfully and maliciously injuring another in his . . . trade, business or profession . . . " Va. Code § 18.2-499. Among other acts, Plaintiff alleges Kamran and Ali "have exerted control over Sure Secure to ensure that" he does not receive the distributions he is due and that they "falsely reported" his and their ownership of Sure Secure to the SBA and the IRS. Dkt. 1-1, ¶ 115. The crux of Plaintiff's civil conspiracy claims appears to be that Defendants Ali and Hussein conspired to commit fraud—a tort.

Plaintiff's statutory civil conspiracy claim against Kamran and Ali does not state a valid claim for relief under Rule 12(b)(6) for several reasons. First, although Plaintiff alleges that the conspiracy in question was a conspiracy to commit fraud, he has not asserted that claim in the

Amended Complaint.[2]  Plaintiff has not cited, and this Court has not found, any applicable case law suggesting a party may bring a naked conspiracy claim arising from a tort without also raising the underlying tort claim.  Second, Plaintiff does not plausibly allege that any benefit Defendants Ali and Hussain might have derived from the alleged conspiracy is distinct from the benefits they inevitably enjoyed by virtue of their roles as owners of Sure Secure.  His concession that Defendants Ali and Hussain "shift[ed] the benefits of ownership away from [Plaintiff] to themselves" forecloses any claim to relief for civil conspiracy he might have under the "independent personal stake" exception to the doctrine of intracorporate immunity—all assuming he were able to allege a statutory civil conspiracy claim based on fraud without also alleging a fraud claim.  *See NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1017 n.9 (E.D. Va. 2018) (rejecting civil conspiracy claim where the complaint did "not allege any independent personal stake of [the company's chief executive] in the conspiracy beyond [his] relationship with [the corporation]."

Accordingly, the Court dismisses with prejudice Count Three of the Amended Complaint as to Defendants Ali and Hussain, the two defendants named in that cause of action.

### D. Breach of Virginia Wage Payment Act (Count Four)

Plaintiff also brings a claim alleging that Defendant Sure Secure violated the Virginia Wage Payment Act, Va. Code § 40.1-29, by withholding his promised bonus payment. Dkt. 1-1, ¶¶ 124-30.  This basis for civil liability was recently amended.  Under the version that took effect July 1, 2020, an employee who is terminated "shall be paid all wages or salaries due [to] him for work performed prior" to his termination, and "such payment shall be made on or before the date

---

[2] Plaintiff also did not assert a fraud claim in his original Complaint. *See generally* Dkt. 1-2.

on which he would have been paid for such work had his employment not been terminated." Va. Code § 40.1-29.

Defendant argues this claim should be dismissed because, at the time Plaintiff was terminated by Sure Secure, the then-operative version of the Virginia Wage Payment Act did not confer a private right of action. Dkt. 8 at 24 (citing previous version of Va. Code § 40.1-29). Plaintiff's cause of action allegedly arose on December 31, 2019, but the amended version of the statute conferring a private right of action did not take effect until July 1 of the following year. Defendant also asserts that a bonus does not fall within the Virginia Wage Payment Act's use of the term "wage." Arguing against dismissal, Plaintiff focuses solely on whether a bonuses may be considered a wage under the Virginia Wage Payment Act—a question of limited impression in Virginia and federal courts.

This Court does not reach that question today, however, because the Virginia Wage Payment Act did not afford Plaintiff a cause of action to sue under the version of the law in operation on December 31, 2019, the date any claim would have arisen. Retroactive application of statutes is "not favored in the law" generally, *Baldwin v. City of Greensboro*, 714 F.3d 828, 835 (4th Cir. 2013), and the same holds true in Virginia. *See Virginia Elec. & Power Co. v. State Corp. Comm'n*, 861 S.E.2d 47, 53 (Va. 2021) ("Virginia law does not favor retroactive application of statutes; instead, we interpret statutes to apply prospectively unless a contrary legislative intent is manifest.") (internal quotations and citations omitted). What is more, the courts that have addressed the retroactivity of the Virginia Wage Payment Act to date have either found or strongly suggested in dicta that the law should not be applied retroactively. *See, e.g.*, *Morris v. Taylor Commc'ns Secure & Customer Sols., Inc.*, 513 F. Supp. 3d 694, 700 n.1 (W.D. Va. 2021) ("[T]he Virginia Wage Payment Act was amended on July 1, 2020. However, because (1) [the employer]

12

terminated [plaintiff] on April 6, 2020, and (2) '[t]he presumption in Virginia is against retroactive application of statutes,' the court will accordingly apply the pre-amendment statute.") (quoting *Berner v. Mills ex rel. Estate of Mills*, 38 Va. App. 11 (2002)); *Trotman v. AM Retail Grp., Inc.*, No. 4:20CV125, 2020 WL 9347968, at *4 (E.D. Va. Nov. 12, 2020) (finding "no evidence" that another provision of the Virginia Wage Payment Act "was intended to have retroactive application").

Accordingly, the Court dismisses with prejudice Plaintiff's claim under the Virginia Wage Payment Act.

### E. False Claims Act Retaliation (Count Five)

Lastly, Plaintiff brings a claim against Defendant Sure Secure for retaliation under the False Claims Act, 31 U.S.C. § 3730(h). Dkt. 1-1, ¶¶ 131-36. In this count, Plaintiff alleges that he "repeatedly expressed concerns" to Defendants Ali and Hussain that Defendant Sure Secure's failure to accurately report the percentage of ownership" in filings with the SBA and other government agencies risked exposing Sure Secure to liability under the False Claims Act. *Id.* ¶ 132. As a result, Defendant Sure Secure allegedly terminated Plaintiff's employment in retaliation against him for raising such concerns about Sure Secure's concealment of its "true ownership" to the SBA and IRS. *Id.* ¶ 134.

The False Claims Act "protects the government against false claims that are presented to it in federal contracts." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018). Congress has amended the statute several times, most recently in 2010, when Congress broadened the False Claims Act to prohibit retaliation "because of lawful acts done . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). A plaintiff pleading retaliation under Section 3730(h) of the

13

False Claims Act "must allege that (1) he engaged in protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against him as a result." *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (citation omitted). Critically, retaliation allegations are sufficient so long as they pass "Rule 8(a)'s relatively low notice-pleadings muster—in contrast to Rule 9(b)'s specificity requirements." *Id.*

Defendant Sure Secure asks the Court to dismiss Plaintiff's retaliation claim on several grounds, arguing that his complaints did not constitute protected activity because he did not objectively believe Sure Secure was violating the FCA; and he has not adequately alleged causation—that is, Plaintiff has not sufficiently alleged that his termination was in retaliation for his protected activity.[3]  Dkt. 8 at 27-30; Dkt. 11 at 19-20.  Plaintiff counters that he has adequately pleaded he engaged in protected activity within the meaning of the False Claims Act and that he has sufficiently alleged that his termination was the product of retaliation for his engagement in protected activity.  Dkt. 10 at 25-30.

Protected activity under the False Claims Act's anti-retaliation section may fit within one of two general rubrics.  First, an employee may engage in protected activity "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." *Grant*, 912 F.3d at 200.  Protected activity within this category must satisfy "the 'distinct possibility' standard, meaning that an employee has engaged in protected activity if "litigation is a distinct possibility, when the conduct could reasonably lead to a viable FCA action, or when . . . litigation is a reasonable possibility." *Mann*

---

[3] Defendant Sure Secure does not appear to dispute that the company knew about Plaintiff's alleged protected activity, so the Court does not address this element.

*v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 344 (4th Cir. 2010) (quoting *Eberhardt Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999)).

Second, a court may also find protected activity when an employee engages in "other efforts to stop [one] or more violations of" the False Claims Act. 31 U.S.C. 3730(h); *see also Grant*, 912 F.3d at 201. This second category of protected activity does not hinge on the distinct possibility standard; instead, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the" False Claims Act." *Grant*, 912 F.3d at 201.

The Court finds that Plaintiff has plausibly alleged he engaged in protected activity within this second category under the False Claims Act. Taking the facts alleged in the Amended Complaint as true, Plaintiff has sufficiently alleged that he believed his employer, Sure Secure, "was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA." *Grant*, 912 F.3d at 202.

Specifically, it was objectively reasonable for Plaintiff to believe that Sure Secure had misrepresented its ownership to the SBA. Plaintiff alleges that after he emailed Defendant Ali demanding action on, among other items, "the correction of the phantom units and ownership units reported to various government entities," he was terminated within days. Plaintiff was later reinstated to his role at Sure Secure pursuant the parties' 2015 Settlement Agreement, and he alleges that the parties agreed his ownership units "would thereafter be accurately reported to appropriate government entities." Additionally, Plaintiff alleges that he met with Defendants Ali and Hussain in 2015 regarding a proposed change in its SBA certification so that the company would be compliant with program requirements; that he understood Defendant Ali met with SBA

15

officials to discuss this proposed change; that Defendant Ali "told Kamran that she would find another way to report Kamran's true ownership" before deciding that the company "would postpone the reporting of his additional 63 equity membership shares until the Company's 'graduation' from" the SBA program; that she submitted a misleading letter to the SBA in 2017; that Plaintiff expressed concerns throughout 2019 that their actions exposed Sure Secured to False Claims Act liability; that no action was taken in response to these warnings; and that his employment was terminated on December 31, 2019. In light of these allegations, the Amended Complaint supports a reasonable inference that Plaintiff took actions intended to stop one or more violations of the False Claims Act.

Additionally, the Court finds that Plaintiff has adequately alleged causation at the pleading stage. Defendant Sure Secure maintains that Plaintiff cannot establish causation, emphasizing that the Amended Complaint alleges "he has been complaining for years and numerous times throughout 2019 that Sure Secure was violating federal law, but Sure Secure did not terminate his employment until December 31, 2019[.]" Dkt. 8 at 30. This argument proves too much. To be sure, if an employee who engages in a single instance of pre-termination protected activity under the False Claims Act plausibly alleges retaliation under the law, so too does a plaintiff who consistently complains of False Claims Act violations.

In fact, the *Grant* Court held that a plaintiff's retaliation claim plausibly alleged a violation under 31 U.S.C. 3730(h) under similar circumstances. In that decision, the Fourth Circuit determined the plaintiff had stated a valid claim for retaliation under the False Claims Act where he had "complained to [company] management on numerous occasions in person and in writing" and his termination "follow[ed] close on the heels of his numerous complaints." Other courts have reached similar conclusions. *See United States ex rel. Oldham v. Centra Health, Inc.*, --- F. Supp.

3d ---, No. 6:18-CV-00088, 2021 WL 2910942, at *5 (W.D. Va. July 12, 2021) (rejecting motion to dismiss False Claims Act retaliation claim where, "[l]ike the plaintiff in *Grant*, [the plaintiff] repeatedly made complaints about fraudulent activity and took steps to investigate the misconduct."). And if "the anti-retaliation provision of the FCA may be invoked by a *former* employee for post-termination retaliation by a *former* employer," as the Sixth Circuit recently held, it would make little sense for this Court to determine that retaliation is not actionable under the False Claims Act where a plaintiff lodged repeated complaints in the months *before* his own termination. *See United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 435 (6th Cir. 2021) (emphases added).

Defendant also cites *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012), arguing that Plantiff's claim must be dismissed based on insufficient temporal proximity between his engagement in protected activity and his termination. But *Kappos* supports the proposition that certain time gaps are insufficient to show causation "without more." *Id.* Where, as here, a plaintiff "provides a plausible explanation for the timeline" of his complaints and his termination, the Court "must accept and construe in his favor" at this early stage of litigation. *See Mason v. Netcom Tech., Inc.*, No. 8:20-CV-03558-PWG, 2021 WL 4286535, at *5 (D. Md. Sept. 21, 2021). Accordingly, the Court finds that Plaintiff has plausibly alleged causation at the motion-to-dismiss stage.

In sum, the facts Plaintiff alleges in the Amended Complaint are "enough to raise a right to relief above the speculative level[,]" *Twombly*, 550 U.S. at 555, and he has therefore stated a claim for retaliation against Defendant Sure Secure under the False Claims Act. The Court therefore denies the Motion to Dismiss as to Count Five of the Amended Complaint.

## IV.  CONCLUSION

For the reasons stated above, it is hereby ORDERED that Defendants' Motion to Dismiss (Dkt. 7) is GRANTED IN PART and DENIED IN PART.  Count One of the Amended Complaint is DISMISSED WITH PREJUDICE as to Defendants Ali and Hussain.  Counts Two, Three, and Four of the Amended Complaint are also DISMISSED WITH PREJUDICE as to all Defendants.  Because Counts One and Five state a claim as to Defendant Sure Secure, the Motion is DENIED as to those counts of the Amended Complaint.

The Clerk of the Court is DIRECTED to terminate Defendants Ali and Hussain as parties to this action and to forward a copy of this Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
September 29, 2021

/s/
Rossie D. Alston, Jr.
United States District Judge